**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| CRISELDA REYES and EMMANUEL REYES, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 2:21-cv-00520-DCN-MGB |
| DORCHESTER COUNTY OF SOUTH CAROLINA and MIKE GOLDSTON, JASON CARRAHER, JASON L. WARD, and JOHN FRAMPTON, *all in their individual and official capacities*, | ) ) ) ) ) | **ORDER** |
| Defendants. | ) ) | |
| _____ | ) | |

This matter is before the court on Magistrate Judge Mary Gordon Baker's report and recommendation ("R&R"), ECF No. 171, that the court deny plaintiffs' motion for summary judgment, ECF No. 120, grant defendants' motion for summary judgment, ECF No. 154, and dismiss the action with prejudice. For the reasons set forth below, the court adopts the R&R in full.

## I.  BACKGROUND

This case arises out of the alleged improper regulation of a single-family home lot located in Hillside Farms Subdivision in Dorchester County, South Carolina (the "Premises"). Plaintiff Criselda Reyes has been the continuous owner of the Premises since purchasing it in December 2019. In December 2019, she, along with plaintiff Emmanuel Reyes (together, the "Reyeses"), examined the closing escrow documents with their closing attorney. According to the amended complaint, there were only two

recorded drainage easements on the Premises, and the Premises' backyard stormwater ditch was not recorded or deeded for public use.

The Reyeses have utilized the Premises as their primary residence since March 2020.  In March 2020, the Reyeses started experiencing overflowing stormwaters arising from a stormwater ditch—a 130-foot-long ditch in the Premises' backyard that accumulated stagnant stormwater and allegedly posed health risks to the Reyeses.  In May 2020, the Reyeses activated a Federal Emergency Management Agency ("FEMA") flood insurance policy to protect their home from overflowing stormwaters, and in June 2020, they installed artificial grass in the Premises' backyard as a deterrent to the stormwater that was retained in the ditch.  The artificial grass was unsuccessful in controlling the flooding.  In July 2020, contractors discovered that the root cause of the improper drainage was a "tennis ball-size[d] hole" on the bottom of the precast concrete box that was buried under two feet of mud.  Id. ¶ 17 (cleaned up).

On July 24, 2020, the Reyeses contacted the Dorchester County Public Works Department and requested that they "connect the drainage pipe by installing 135 feet . . . of HDPE corrugated pipe to the stormwater box" to control the flooding from storms.  ECF No. 164-6 at 2.  Defendant Mike Goldston, a Dorchester County Public Works Engineer, responded that the Reyeses' property "has a stormwater pond on the rear of the property that serves Hillside Farms.  As owner of this property you are responsible to maintain the pond."  Id.  Goldston attached a summary of maintenance requirements for the stormwater pond.

In August 2020, the Reyeses hired contractors who recommended connecting the two recorded drainage easements with stormwater drainage pipes to solve the stormwater

intrusions.  The contractors began the maintenance and documented it through its completion.  The Reyeses did not obtain a permit from Dorchester County to fill in the stormwater pond.  ECF No. 154-8.

On September 1, 2020, the Reyeses allegedly witnessed and video-recorded two unidentified individuals—one of whom was later identified in the amended complaint as Goldston—entering the back of the Premises through the neighboring properties.  The two individuals proceeded to conduct an allegedly "unlawful search and surveillance of the Premises."  ECF No. 14, Amend. Compl. ¶ 19.  In a letter dated September 1, 2020, Goldson sent the Reyeses a "Notice of Violation" ("NOV") wherein he wrote that based on an inspection conducted on September 1, 2020, the Reyeses were in "direct violation of the Dorchester County Stormwater Management Program Ordinance #07-21" ("Ordinance 07-21") for filling in the stormwater pond.  Ordinance 07-21 states, in relevant part: "No person shall create a blockage of an open channel or pipe system used to convey or transport stormwater runoff from one property to another separately owned property."  Id. ¶ 13 (quoting Ordinance 07-21 § 3.2(c)) (emphasis in original).  The NOV stated that fines up to $1,000 per day could be assessed for failure to restore the pond to its original condition.  ECF No. 120-1 at 5.  Goldson sent a second letter on September 9, 2020, indicating that after another inspection conducted on September 8, 2020, the stormwater pond had not been restored and the Reyeses were fined $1,000 "and are subject to fines up to one thousand dollars . . . per violation/day from the date of the NOV."  ECF No. 120-1 at 6.

In September 2020, the Reyeses appealed the NOV to defendants John Frampton ("Frampton"), the County Attorney for Ordinance Enforcement, and Jason L. Ward

("Ward"), a county administrator. On September 30, 2020, Ward responded that the Reyeses' appeal of the NOV had been reviewed and denied. Id. at 7–8.

In October 2020, the Reyeses invited Goldston and Frampton to the Premises to identify a "common-sense" solution. Id. ¶ 24. Goldston and Frampton accepted the invitation, but allegedly claimed at the meeting that they would pursue criminal charges unless the stormwater pond was fully restored. On November 12, 2020, Goldston sent the Reyeses a fourth letter indicating that they had failed to appeal the denial and Dorchester County would resume assessing $1,000 per day in fines; however, Dorchester County would be willing to forgive the civil penalties if the Reyeses completely restored the stormwater pond within thirty days. ECF No. 120-1 at 9–10. On December 22, 2020, Frampton sent a letter to the Reyeses' attorney dismissing their claim that no easement existed over the stormwater management facility and stating that the civil penalties would continue to accrue. Id. at 11.

On March 9, 2021, the South Carolina Department of Health and Environmental Control ("DHEC") sent its own NOV to the Reyeses, copying Goldman, explaining that Dorchester County officials had informed DHEC of violations to DHEC's regulations concerning proper maintenance of stormwater management. ECF No. 120-1 at 2. The letter stated that the Reyeses had fifteen days to respond with how they planned to address the restoration of the detention pond or risk an enforcement action.

On February 19, 2021, the Reyeses, proceeding pro se, filed the instant action against defendants. Pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C), all pretrial proceedings in this case were referred to Magistrate Judge Baker. On April 12, 2021, the Reyeses filed their amended complaint, now the

operative complaint, Amend. Compl.  On March 18, 2022, the court granted in part and denied in part defendants' motion to dismiss.  ECF No. 58, amended by ECF No. 66.  As a result, the claims against the following defendants remain pending: (1) § 1983 claims against Dorchester County for failure to train under the Fourth Amendment and for regulatory taking under the Fifth and Fourteenth Amendments; (2) § 1983 claims against Goldston for unlawful searches under the Fourth Amendment and for regulatory taking under the Fifth and Fourteenth Amendments; and (3) § 1983 claims against Ward and Frampton for regulatory taking under the Fifth and Fourteenth Amendments.

On January 20, 2023, the Reyeses filed their motion for summary judgment.  ECF No. 120.  Defendants responded in opposition on February 8, 2023, ECF No. 133, and the Reyeses replied on February 21, 2023, ECF No. 142.  With leave of the court, defendants filed a sur-reply on April 20, 2023.  ECF No. 165.  On March 15, 2023, defendants filed their motion for summary judgment.  ECF No. 154.  The Reyeses responded on April 17, 2023, ECF No. 164, and defendants replied on April 24, 2023, ECF No. 166.  On May 9, 2023, the Reyeses filed a motion to appoint a master pursuant to Federal Rule of Civil Procedure 53, ECF No. 167, and defendants filed a response on May 10, 2023, ECF No. 170.  On May 11, 2023, Magistrate Judge Baker issued the R&R, recommending that the deny the Reyeses' motion for summary judgment, grant defendants' motion for summary judgment, and deny the motion to appoint a master.  ECF No. 171, R&R.  On May 30, 2023, the Reyeses filed their objections to the R&R, ECF No. 174.  Defendants responded to the objections on June 19, 2023, ECF No. 178, and the Reyeses replied on July 11, 2023, ECF No. 184.  As such, the matter is now ripe for the court's review.

## II.  STANDARD

### A.  Order on R&R

This court is charged with conducting a <u>de novo</u> review of any portion of the magistrate judge's R&R to which specific, written objections are made.  28 U.S.C. § 636(b)(1).  A party's failure to object is accepted as agreement with the conclusions of the magistrate judge.  <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 149–50 (1985).  The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination rests with this court.  <u>Mathews v. Weber</u>, 423 U.S. 261, 270–71 (1976).  The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge . . . or recommit the matter to the magistrate judge with instructions."  28 U.S.C. § 636(b)(1).  The court is charged with making a <u>de novo</u> determination of any portion of the R&R to which a specific objection is made.  <u>Id.</u>  However, in the absence of a timely filed, specific objection, the court reviews the R&R only for clear error.  <u>Diamond v. Colonial Life & Accident Ins. Co.</u>, 416 F.3d 310, 315 (4th Cir. 2005) (citation omitted).  Furthermore, "[a] party's general objections are not sufficient to challenge a magistrate judge's findings."  <u>Greene v. Quest Diagnostics Clinical Labs., Inc.</u>, 455 F. Supp. 2d 483, 488 (D.S.C. 2006) (citation omitted).  When a party's objections are directed to strictly legal issues "and no factual issues are challenged, <u>de novo</u> review of the record may be dispensed with."  <u>Orpiano v. Johnson</u>, 687 F.2d 44, 47 (4th Cir. 1982) (citation omitted).  Analogously, <u>de novo</u> review is unnecessary when a party makes general and conclusory objections without directing a court's attention to a specific error in a magistrate judge's proposed findings.  <u>Id.</u>

### B. Motion for Summary Judgment

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

### C. Pro Se Litigants

Plaintiffs are proceeding pro se in this case. Pro se complaints and petitions should be construed liberally by this court and are held to a less stringent standard than those drafted by attorneys. See Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978), cert. denied, 439 U.S. 970, 99 (1978). A federal district court is charged with liberally construing a complaint or petition filed by a pro se litigant to allow the development of a potentially meritorious case. See Hughes v. Rowe, 449 U.S. 5, 9 (1980). Liberal

7

construction, however, does not mean that the court can ignore a clear failure in the pleading to allege facts that set forth a cognizable claim.  See Weller v. Dep't of Soc. Servs., 901 F.2d 387, 390–91 (4th Cir. 1990).

## III.  DISCUSSION

The following categories of claims remain pending: (1) a regulatory taking claim based on a violation of the Fifth and Fourteenth Amendment asserted against Dorchester County, Goldston, Ward, and Frampton, and (2) an unlawful search claim in violation of the Fourth Amendment asserted against Goldston and Dorchester County.  The court analyzes both categories of claims in turn.

### A.  Regulatory Taking

Count IV of the amended complaint alleges that Ordinance 07-21 is a regulation that effectively takes the Reyeses' private property for public use, without just compensation, in violation of the Fifth Amendment's takings clause.  Amend. Compl. ¶ 48(d).  The amended complaint alleges that the Dorchester County officials' communications and demands based on Ordinance 07-21 also constituted a taking.  Id. ¶ 48(e).

The court previously determined that the Reyeses are alleging a partial taking. ECF No. 66 at 12.  A partial taking occurs when a regulation burdens an owner's property but does not deprive an owner of all economic use of its property.  Murr v. Wisconsin, 137 S. Ct. 1933, 1942–43 (2017); United States v. Banisadr Bldg. Joint Venture, 65 F.3d 374, 378 (4th Cir. 1995) (explaining that a partial taking occurs when "the Government has taken one part of a larger tract, leaving the remainder to the

landowner"). The court previously denied defendants' motion to dismiss the Reyeses' partial taking claim. ECF No. 66 at 30.

After the parties had the benefit of discovery, the magistrate judge recommended granting summary judgment in defendants' favor. In reaching that conclusion, the magistrate judge analyzed the factors articulated in <u>Penn Central Transportation Co. v. City of New York</u>, 438 U.S. 104 (1978). Courts apply the <u>Penn Central</u> factors when there is a partial taking—<u>i.e.</u>, "when a regulation such as a zoning ordinance causes substantial economic harm but does not deprive the landowner's property of all economic value." <u>Adams v. Village of Wesley Chapel</u>, 259 F. App'x 545, 549 (4th Cir. 2007). Under <u>Penn Central</u>, the court must balance "'a complex of factors,' including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." <u>Murr</u>, 137 S. Ct. at 1237 (quoting <u>Palazzolo v. Rhode Island</u>, 533 U.S. 606, 617 (2001)). "The first two factors—economic effects and investment-backed expectations—are 'primary among those factors.'" <u>Clayton Farm Enters., LLC v. Talbot Cnty.</u>, 987 F.3d 346, 353 (4th Cir. 2021) (quoting <u>Lingle v. Chevron, U.S.A., Inc.</u>, 544 U.S. 528, 538–39 (2005)). Since the Reyeses object to the magistrate judge's application of the test, the court addresses each factor <u>de novo</u> and ultimately finds that the test does not support finding a taking.

### 1. Economic Impact

In the Fourth Circuit, prevailing on the economic impact factor "requires that a plaintiff allege that the challenged regulation caused a <u>substantial</u> diminution in value to the regulated property." <u>Blackburn v. Dare Cnty.</u>, 58 F.4th 807, 812 (4th Cir. 2023),

petition for cert. filed, (Apr. 28, 2023) (citing Clayland Farm Enters., LLC v. Talbot Cnty., 987 F.3d 346, 354 (4th Cir. 2021)) (emphasis in original).  The court previously allowed the Reyeses' takings claim to proceed, finding that the complaint had made threshold allegations that Ordinance 07-21 prevented necessary maintenance on land— which caused the Reyeses to purchase FEMA flood insurance—and otherwise diminished the property value of the land.  ECF No. 66 at 28.  In their motion for summary judgment, defendants respond to those allegations, arguing that the Reyeses have failed to provide any evidence that (1) they ever paid the premium for the insurance policy, (2) the Ordinance caused them to activate the insurance policy, (3) that they suffered health risks or made payments to health care providers related to said risks, or (4) the property value of the Premises was otherwise diminished.

The magistrate judge agreed on each point.  First, the magistrate judge noted that although the Reyeses had produced a "Preferred Risk Policy Application" for a one-year insurance policy starting on May 13, 2020, with a premium of $516.00, there was no evidence that the Reyeses ultimately paid that premium.  R&R at 11 (citing ECF No. 164-7).  Second, even if they had paid the premium, the amount would not rise to the level of constituting a substantial diminution in value.  Id.  Third, although the Reyeses produced photos of the backyard ditch filled with stormwater prior to when they filled in the stormwater pond, they produced no evidence of the monetary impact caused by the alleged health risks.  Id. (citing ECF No. 164-8).  Fourth, although the Reyeses provided a supporting "letter" from an individual named John Duffy ("Duffy")—who is purportedly a "licensed and registered[] professional engineer," ECF No. 164-11—the Reyeses never designated him as an expert, R&R at 11–12.  Additionally, Duffy visited

the Premises approximately two years after the Reyeses had already filled in the

stormwater pond, and he failed address the monetary impact of the issues that he

identified.  R&R at 12.

In response,[1] the Reyeses argue that the magistrate judge failed to consider

evidence that they paid their insurance premium, claiming to "again attach the Flood

Insurance Policy and Receipt of payment."  ECF No. 174 at 3.  The court notes that the

new exhibit adds a receipt page that was not in the original exhibit considered by the

magistrate judge.  Compare ECF No. 164-7, with ECF No. 174-1 at 4.  In any case, the

Reyeses miss the forest from the trees.  The chief issue was not whether the Reyeses took

out the policy but whether they proved that doing so caused a diminution in value—the

magistrate judge found there was no substantial diminution even if the premium had been

paid.  The Reyeses encounter a similar issue when they argue (for the first time) that the

alleged government taking has caused them to pay taxes on land for which they do not

enjoy the use.  ECF No. 174 at 3.  Plaintiffs ignore the crux of the magistrate judge's

analysis, which is that plaintiffs failed to prove that Ordinance 07-21 caused a substantial

diminution in the value of the Premises.  R&R at 12 (citing Clayland Farm, 987 F.3d at

354 (holding that the first factor weighed against the plaintiffs when they alleged only a

40% diminution in value)); see also Pulte Home Corp., v. Montgomery Cnty., 271 F.

Supp. 3d 762, 776–77 (D. Md. 2017) (finding that the plaintiffs had "not pleaded with

---

[1] For good reason, the Reyeses appear to have abandoned the argument that they suffered a diminution in property value based on the fines that were levied.  See ECF No. 164 at 7.  As the court previously noted, "the issue of economic impact 'is not wholly reducible to the imposition of fines.'"  ECF No. 66 at 28 (quoting Leon v. Hayward Bldg. Dep't, 2017 WL 3232486, at *6 (N.D. Cal. July 31, 2017)).  In any case, the magistrate correctly noted that there is no evidence that defendants ever sought to collect any of the assessed fines.  R&R at 11.

specificity how much the value of their property was diminished" and that even if they had, courts have declined to find a taking in cases where plaintiffs have shown as high as an "81% percent diminution in value").  In the absence of any specific argument about the amount that the Reyeses claim to have lost, the factor weighs in defendants' favor.

### 2.  Investment-Backed Expectations

Under the second factor, the court examines "the extent to which the regulation has interfered with distinct investment-backed expectations . . . founded on a preexisting property right."  Blackburn, 58 F.4th at 813 (internal quotation marks and citations omitted).  Those expectations must "be reasonable given the current use of the property."  Id. (citing Quinn v. Bd. of Cnty. Comm'rs, 862 F.3d 433, 442–43 (4th Cir. 2017)).

The Reyeses argue that they had an investment-backed expectation that there were no encumbrances on the Premises when they purchased it.  The magistrate judge found that viewed in the light most favorable to the Reyeses, it was reasonable to believe that they were not aware that the ditch on the property was a stormwater pond subject to Ordinance 07-21 and that they would not be allowed to maintain or alter the stormwater pond.  R&R at 14.  The magistrate judge also determined that viewed in the light most favorable to the Reyeses, there was no strong evidence that they should have reasonably anticipated such a regulation would exist given that the Premises are not in a flood zone or other inherently-dangerous area.  Id.  Nevertheless, the magistrate found that the ability to alter the ditch in the backyard was not an investment-backed expectation that the Reyeses should have affirmatively held.  In other words, the fact that the Reyeses were not aware that the ditch was a stormwater pond cut against them, too, because it meant they could not assert that they invested in the Premises specifically with the

expectation that they would be allowed to alter the ditch.  Id. at 14–15 (citing Columbia Venture, L.L.C. v. Richland Cnty., 776 S.E.2d 900, 914 (S.C. 2015)); see also Nance v. City of Albemarle, 520 F. Supp. 3d 758, 799 (M.D.N.C. 2021) (holding that without the building permit ever in hand, the plaintiffs could not claim that a revocation of the right to build constituted the loss of an investment-backed expectation).

The Reyeses fail to object to the substance of the recommendation.  The Reyeses reference a portion of the R&R noting that the neighborhood Property Owners' Association president, Charles Halderman ("Halderman"), stated he noticed increased water flow in his own backyard after the Reyeses filled in their stormwater pond.  R&R at 18; ECF No. 133-3 ¶ 6.  The magistrate judge made this observation under its analysis of the third Penn Central factor, specifically to note that the Reyeses actions created a nuisance.  R&R at 17–18.  The Reyeses claim the magistrate judge overlooked the fact that Halderman has a "[b]ack yard river" behind his property, ECF No. 174 at 4, but the Reyeses' objection is misdirected.  The Reyeses fail to direct any arguments to the magistrate judge's conclusions regarding their own investment-backed expectations— namely, that the Reyeses did not invest in the Premises specifically with the expectation that they would be allowed to alter the ditch.  In the absence of a relevant objection, the court adopts the magistrate judge's finding on the second Penn Central factor and finds that it weighs in defendants' favor.

### 3.  Character of the Governmental Action

In general, the third Penn Central factor asks courts to determine if the governmental action "amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic

life to promote the common good." Lingle, 544 U.S. at 539 (internal quotation marks and citation omitted). The Fourth Circuit has explained that the precise application of this factor is "a little fuzzy," and as such "courts have treated this factor as an open-ended inquiry into whatever considerations they think are most relevant in each specific case." Blackburn, 58 F.4th at 813.[2]

Both parties coalesce around arguing that the important considerations here involve whether Ordinance 07-21 serves the public interest or, conversely, whether the ordinance violates South Carolina's common enemy rule. The court finds that those considerations are interrelated. Ostensibly, if plaintiffs can show that Ordinance 07-21 conflicts with the common enemy rule, the ordinance would not be in the public interest. "South Carolina follows the common enemy rule which allows a landowner to treat surface water as a common enemy and dispose of it as he sees fit." Silvester v. Spring Valley Country Club, 543 S.E.2d 563, 566 (S.C. Ct. App. 2001) (citing Glenn v. Sch. Dist. No. Five of Anderson Cnty., 366 S.E.2d 47, 49 (S.C. Ct. App. 1988)). As defendants note, South Carolina law also recognizes an exception to the common enemy rule: a landowner "may not use his land in a manner to create a nuisance." Glenn, 366

---

[2] In Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992), the Supreme Court declined to weigh public versus private interests when determining whether a regulatory taking had been effected, holding instead that a regulatory taking would require compensation unless the regulation proscribed a nuisance. But in 2001, the Supreme Court clarified that the applicability of Lucas was limited to "total" or permanent takings. Palazzolo, 533 U.S. at 615–16. As such, under the Penn Central test for partial takings, courts are permitted to look to the public purposes served by the government's regulatory actions. See id. at 634 (O'Connor, J., concurring) ("The purposes served, as well as the effects produced, by a particular regulation inform the takings analysis."); see also Penn Central, 438 U.S. at 127 ("[A] use restriction on real property may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose . . . or perhaps if it has an unduly harsh impact upon the owner's use of the property.").

S.E.2d at 49.  Under South Carolina law, a nuisance is a substantial and unreasonable interference with another's use and enjoyment of his property.  Silvester, 543 S.E.2d at 566.

Applying this framework, the magistrate judge determined that the common enemy rule did not apply because the Reyeses created a nuisance by filling in the stormwater pond.  In addition to the statement from Halderman discussed above, Ward—the county administrator—explained to the Reyeses that "[b]y piping the existing dry detention basin," they had "increased the volume and rate of discharge of stormwater into the wetland as well as prevented the removal of pollutants from the stormwater prior to discharge into the wetland."  ECF No. 120-1 at 8.  Again, the Reyeses argue in their objections that Halderman has a "back yard river" behind his property, ECF No. 174 at 4,[3] but even if that assertion is true, it is unclear what the import of the argument is.  Assuming the Reyeses are correct that their neighbor has a waterway of some kind in his property, Halderman's statement is evidence that he experienced an increased amount of water on his property following the Reyeses' construction work.  See ECF No. 133-3 ¶ 6 ("Since Lot 10 filled in the retention pond, I have noticed an increase[] in water during heavy rains on the rear of our property . . . .").

The Reyeses also argue that Ward's letter contains "no supporting scientific facts" to back the assertion that the Reyeses created a nuisance.  But that appears to be more the case with the Reyeses, who offer no supporting documentation whatsoever showing that

---

[3] In support, the Reyeses attach a screenshot from a YouTube video titled "Back yard river" that was purportedly posted by Halderman.  ECF No. 174-3.  This document appears to have been produced for the first time in the Reyeses' objections, and as the court further explains, does not alter the court's decision.

their actions did not interfere with the use of another's land.  As such, the court agrees with the magistrate judge that no reasonable juror could determine that the Reyeses used their land in a way that was consistent with the common enemy rule.

Even if the creation of a nuisance were a disputed issue, there is supporting evidence that Ordinance 07-21 otherwise serves the public interest.  The magistrate judge determined that the ordinance furthered its stated purposes of controlling pollution and flooding and protecting "the health and welfare of the citizens, environment, and economy of Dorchester County."  R&R at 16, 20.  The magistrate concluded that the purpose of the ordinance was to essentially prevent nuisances like flooding and pollution, and as such, there was "no inherent conflict between the common enemy rule and Ordinance 07-21."  Id. at 18.  The Reyeses do not argue in the objections that the stated purposes of the ordinance are invalid.  Instead, they raise several claims suggesting that the ordinance otherwise had an unduly harsh impact on them and did not serve the public interest.  First, they claim that a "Performance and Maintenance Bond" (the "Bond") paid by the Dorchester County's Public Works Department proves that Dorchester County took thirty percent of the Premises without just compensation.  ECF No. 174 at 4–5.  Second, they argue that Dorchester County lacks authority to regulate wetlands pursuant to United States Supreme Court precedent.

As a preliminary matter, both arguments are raised for the first time[4] in the Reyeses' objections and are thus untimely.  See Addison v. CMH Homes, Inc., 47 F.

---

[4] In their original response to defendants' motion for summary judgment, the Reyeses had instead argued that Dorchester County selectively enforced Ordinance 07-21 by discriminating against Asian-Americans, like the Reyeses, during the COVID-19 pandemic.  ECF No. 164 at 8.  The magistrate judge found that based on the record, there was no evidence that Ordinance 07-21 unfairly burdened the Reyeses.  R&R at 19.  The

Supp. 3d 404, 412 (D.S.C. 2014) (stating that the court has no obligation to consider new arguments a party raises for the first time in her objections to an R&R).  Even if the court were to consider the arguments, the court finds that they fail to move the needle.  First, the Reyeses' argument about the Bond is misguided.  They refer to a letter sent by a third-party engineer to the Dorchester County Public Works Department providing bond amounts based on the "fair market value of the construction [costs]."  ECF No. 174-5. Among other costs, the staff engineer modeled costs for "296 LF" of 24-inch diameter storm drainage outfall structures.  Id.  The Reyeses seem to believe that Dorchester County "only installed 52 LF" of those structures, and instead of building outfall structures adjacent to the Premises, "built an undocumented . . . stormwater dry detention ditch" on the Premises.  ECF No. 174.  But none of those assertions are supported by the document.  The letter itself shows construction costs for the entire subdivision; there is no evidence that the projects were never completed, must less that the projects were supposed to be on the Reyeses' Premises.  The court overrules the objection.

Second, the Reyeses argue that Dorchester County lost the authority to regulate stormwater facilities after the Supreme Court issued its recent decision in Sackett v. EPA, 143 S. Ct. 1322 (2023).  The Reyeses cite the following portion of the Supreme Court's opinion:

> In sum, we hold that the [Clean Water Act] extends to only those wetlands that are "as a practical matter indistinguishable from waters of the United States." [Rapanos v. United States, 547 U.S. 715, 755 (2006) (plurality opinion)].  This requires the party asserting jurisdiction over adjacent wetlands to establish "first, that the adjacent [body of water constitutes] . . . 'water[s] of the United States,' (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and

Reyeses do not object to the finding or otherwise reraise the argument, and the court finds no clear error in the magistrate judge's conclusion.

> second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." <u>Id.</u>, at 742[].

<u>Id.</u> at 1341. The Reyeses argue that since Ordinance 07-21 derives its authority from the Clean Water Act—and "there is no water on the Plaintiff's property" or "continuous surface connection to . . . 'waters of the United States'"—the holding in <u>Sackett</u> effectively curtails Dorchester County's authority to regulate the stormwater pond. ECF No. 174 at 6.

<u>Sackett</u> has no applicability to the instant matter. The case concerns a <u>federal agency's</u> (<u>i.e.</u>, the EPA) authority to regulate wetlands. The Supreme Court specifically explained that "States can and will continue to exercise their primary authority to combat water pollution by regulating land and water use." <u>Sackett</u>, 143 S. Ct. at 1344. In reply, the Reyeses argue that Dorchester County "simultaneously shares the regulation of Wetlands with the Federal Government." ECF No. 184 at 4. The Reyeses provide no support for the assertion. At best, the ordinance was enacted to comply with the county's obligations under the Clean Water Act, ECF No. 154-42 at 6, but there is no reason to find that the Supreme Court's holding applies here. Therefore, the court need not determine whether the Premises qualify as "waters of the United States" and overrules the objection.

Since the court finds under a <u>de novo</u> review that Ordinance 07-21 is harmonious with South Carolina's common enemy rule and further serves the goals of pollution control and other interests, the third <u>Penn Central</u> factor weighs in defendants' favor. Based on the three factors, the court finds that the Reyeses have not shown a taking under the Fifth Amendment and grants summary judgment in defendants' favor on that claim.

## B. Fourth Amendment

Count II of the amended complaint alleges that Dorchester County violated the Fourth Amendment pursuant to 42 U.S.C. § 1983 due to a failure to train its officials regarding warrantless entries onto the private properties of Dorchester County citizens. Amend. Compl. ¶¶ 35–39. Count III alleges that Goldston[5] violated the Fourth and Fourteenth Amendment pursuant to 42 U.S.C. § 1983 by entering the Reyeses' private property without an administrative warrant, consent, or legal justification. Amend. Compl. ¶¶ 40–46.

The court considers the claims in reverse order, starting with the claim against Goldston. Since the court adopts the R&R and finds that Goldston did not commit a Fourth Amendment violation—and thus there was no underlying constitutional violation—the court finds below that both Goldston and Dorchester County are entitled to summary judgment on Counts III and II, respectively.

### 1. Goldston

The amended complaint alleges that in the early afternoon of September 1, 2020, Goldston and an unidentified colleague entered the Reyeses' private property through neighboring lots to conduct an unlawful search and surveillance of the Premises. Amend. Compl. ¶ 19. The amended complaint further alleges that Goldston and the colleague again entered the property on September 8, 2020, and on other dates. Id. ¶ 41. During

---

[5] Count III originally alleged that along with Goldston, defendants Carraher, Ward, and Frampton also engaged in similar wrongdoing. The court dismissed the count as alleged against Carraher, Ward, and Frampton for failure to state claim. ECF No. 66 at 22.

summary judgment proceedings, the parties only produced evidence of a visit on September 1, and the Reyeses no longer aver that other visits occurred.

In their motion for summary judgment, defendants advanced several reasons why a "search" subject to the Fourth Amendment's guarantee against unreasonable search and seizure did not occur on that date. First, under the plain-view (or open-view) doctrine, no Fourth Amendment violation occurred. ECF No. 154 at 18. Second, no Fourth Amendment search occurred based on the test outlined in Katz v. United States, 389 U.S. 347 (1967). Id. at 20. Third, to the extent a search occurred, Goldston's actions were shielded under qualified immunity and good faith. Id. at 22.

The magistrate judge considered defendants' first argument and determined that since Goldston was standing on or next to an easement and was viewing open fields, no Fourth Amendment violation occurred. R&R at 28–30. The magistrate judge therefore did not need to consider the remaining bases for summary judgment. The Reyeses object to the magistrate judge's finding, and the court reviews the issue below.

The issue of whether an individual has a legitimate expectation of privacy turns upon whether the area "was within the curtilage of the house or, conversely, was an 'open field' not subject to the protection of the Fourth Amendment." United States v. Breza, 308 F.3d 430, 435 (4th Cir. 2002) (citing Oliver v. United States, 466 U.S. 170, 180 (1984)). This rule stems from the principle that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz, 389 U.S. at 351. To decide whether a search occurred within the curtilage or open fields, courts consider four factors: (1) the proximity of the area to the home, (2) the presence of an enclosure connecting the property to the home, (3) how the

property is used, and (4) steps taken to prevent observation of the area by passers-by.

United States v. Vankesteren, 553 F.3d 286, 289 (4th Cir. 2009) (citing United States v.

Dunn, 480 U.S. 294, 301 (1987)) (referenced by the magistrate judge and the parties as

the "Dunn factors").

 Before turning to the Reyeses' objections, the court finds it instructive to clarify

the R&R's precise finding.  When deposed, Goldston claimed that he knew there was a

twenty-foot-wide drainage easement granted to Dorchester County Public Works running

along the boundary separating the Premises (Lot 10) and a neighboring lot (Lot 9).  ECF

No. 120-4 at 13, Goldston Dep. at 13:9–17.  Goldston testified that he obtained

permission from the owners of the neighboring properties to walk across their properties

to access the easement.  Id. at 15, Goldston Dep. at 15:8–24.  As such, Goldston believed

he was permitted to stand on the land from where he viewed the Premises.  In their

motions, the parties disagreed on whether Goldston was standing on an easement.  To

support their position that Goldston was on the easement, defendants produced a copy of

the "Hillside Farms Final Subdivision Plat," which depicts a twenty-foot-wide drainage

easement separating Lots 9 and 10.  ECF No. 133-1 at 24.  The Reyes countered that they

measured the drainage pipe and found that it was forty-five feet long, meaning "it did not

match the recorded plat of a 20-foot drainage easement, so [Goldston] was not on an

easement; he was on [the Reyeses'] property."[6]  ECF No. 165-8 at 2, Emmanuel Dep. at

118:15–18.

---

[6] The magistrate judge expressed some confusion over this argument, which the court shares.  R&R at 24 n.9.  But like the magistrate judge explained, the issue does not alter the court's decision.  Id.  Therefore, although the court finds the subdivision plat to be convincing evidence that the easement existed as Goldston described it, the court does not resolve the issue as a matter of law.

The magistrate judge acknowledged the dispute over whether Goldston was standing within an easement, and importantly, reached a recommendation without resolving the issue one way or the other.  The magistrate judge determined that "[e]ven if the strip of land [where Goldston stood] did not fall within an easement," the area was still part of an open field, meaning the Reyeses had no reasonable expectation of privacy there.  R&R at 29–30; see also id. at 30 ("Based on the foregoing, the undersigned finds the strip of land on which Goldston made his observations constituted an open field for purposes of the Fourth Amendment.").[7]

In their objections, the Reyeses misconstrue the R&R.  They claim that the R&R "wrongly concluded that Goldston was . . . . standing on the unmarked easement[]" and instead should have found that Goldston had entered the Reyeses' property.  ECF No. 174 at 7.  As outlined above, that was not the conclusion of the R&R.  The magistrate judge found that even if the strip of land where Goldston stood on was not an easement, that area was still part of the open fields.[8]  Based on the Dunn factors, there was no Fourth Amendment violation stemming from Goldston's presence on the land, even if it

---

[7] The Reyeses moved to appoint a special master to help determine the boundaries of the easement, ECF No. 167, and the magistrate judge recommended denying the motion, R&R at 32.  Based on the court's reading of 28 U.S.C. § 636(b)(1)(A), the magistrate was permitted to decide whether to appoint a master as a pretrial matter.  In the interest of efficiency, the court adopts the recommendation and finds that Rule 53 does not provide for the appointment of a master here.

[8] The Reyeses confusion is somewhat understandable, but as courts have noted, one's visit to property can "perhaps [be] a trespass" but "not a search under the Fourth Amendment."  Widgren v. Maple Grove Twp., 429 F.3d 575, 580 (6th Cir. 2005); see Reeves Bros., Inc. v. EPA, 956 F. Supp. 665, 669 (W.D. Va. 1995) ("[A]n action that would be trespass under the common law, does not give rise to a Fourth Amendment violation.").

were only <u>near</u> the easement, and he did not conduct an unlawful search by observing the stormwater pond from that position.  R&R at 30.

Beyond arguing that Goldston stepped onto their land, the Reyeses only cursorily argue that the magistrate judge improperly applied the <u>Dunn</u> factors.  Under the first factor—the proximity of the area to the home—they argue that Goldston was not standing on an easement.  ECF No. 174 at 7.  Again, that argument is not germane since the magistrate judge did not definitively find that the area was an easement.  Under the second factor—the presence of an enclosure connecting the property to the home—the Reyeses argue that Goldston "had to walk through about four private property Lots" to reach the area.  <u>Id.</u> at 8.  The magistrate judge considered this very argument and determined that the second factor did not weigh in either party's favor.  R&R at 29.  The Reyeses do not object to the magistrate judge's findings under the third and fourth factors.  Although the court does not find that the Reyeses have raised any new legal objections, the court notes that even under a <u>de novo</u> review, the court agrees that the factors weigh in defendants' favor.  Most notably, the fourth factor—steps taken to prevent observation of the area—leans strongly in defendants' favor.  This factor weighs against finding a curtilage where "nothing prevent[s] the public from viewing the area," including a "chain link fence [to] stop neighbors in adjacent properties."  <u>United States v. Alexander</u>, 888 F.3d 628, 634 (2d Cir. 2018).  In the light most favorable to the Reyeses, Goldston may have stepped onto their property, but the Reyeses had not done anything to prevent observation of the area.  The area was part of an open field, meaning the Reyeses had no expectation of privacy there.

In sum, the court finds that regardless of whether Goldston was standing on an easement when he observed the stormwater pond, Goldston did not conduct a "search" that violated the Fourth Amendment. Accordingly, the court grants summary judgment in defendants' favor on the claim against Goldston.

### 2. Dorchester County

A claim against a municipality for failure to train cannot lie "where there is no underlying constitutional violation by the employee." Johnson v. Balt. Police Dep't., 500 F. Supp. 3d 454, 459–60 (D. Md. 2020); see City of L.A. v. Heller, 475 U.S. 796, 799 (1996) ("[N]either Monell . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when the jury has concluded that the officer inflicted no constitutional harm."); Anderson v. Caldwell Cnty. Sheriff's Off., 524 F. App'x 854, 862 (4th Cir. 2013) ("No actionable claim against supervisors or local governments can exist without a constitutional violation committed by an employee."). The Reyeses provide no legal objection to that principle of law. Since the court finds that Goldston did not commit a Fourth Amendment violation as a matter of law, the court finds that Dorchester County could not have committed a Fourth Amendment violation by failing to properly train Goldston or other employees. Therefore, the court grants summary judgment in defendants' favor on all Fourth Amendment claims.

### IV.   CONCLUSION

For the foregoing reasons the court **ADOPTS** the R&R, **DENIES** plaintiffs' motion for summary judgment, and **GRANTS** defendants' motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 21, 2023**
**Charleston, South Carolina**